Filed 7/28/15  P. v. Alcantar CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELEAZAR TAPIA ALCANTAR,<br><br>    Defendant and Appellant. | F067484<br><br>(Super. Ct. No. VCF268134)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Eleazar Tapia Alcantar (defendant) stands convicted, following a jury trial, of first degree murder in which he personally used a firearm, and personally and intentionally discharged a firearm, proximately causing death (Pen. Code,[1] §§ 187, subd. (a), 12022.53, subds. (b)-(d), 12022.5, subd. (a); count 1), assault with a firearm in which he personally used a firearm (§§ 245, subd. (a)(2), 12022.5, subd. (a); counts 2 & 3), and possession of a firearm by a prohibited person (§ 29805; count 4). He was sentenced to 19 years plus 50 years to life in prison, and ordered to pay restitution and various fines and assessments.

We hold section 1157 does not require us to reduce the homicide verdict to second degree murder, there was sufficient evidence the killing was premeditated and deliberate, and trial counsel was not ineffective for failing to request the giving of CALCRIM No. 522. Accordingly, we affirm, although we order the correction of clerical errors in the sentencing minute order and abstract of judgment.

## FACTS

### I

#### PROSECUTION EVIDENCE

The course of defendant's 20-year relationship with Maria Teresa Alcantar (Teresa) was often rocky.[2]

When Hitzia (who was 23 at the time of trial) was about 13, she heard defendant screaming at Teresa and saw him push her onto the bed. When Hitzia told him to leave Teresa alone, defendant told her to leave. Hitzia left the room, but could hear her parents arguing and Teresa crying.

---

[1] All statutory references are to the Penal Code.

[2] Maria Teresa Alcantar went by the name "Teresa." For clarity, we refer to her by that name, and to her and defendant's children (Pedro, Hitzia, Gladys, and Adrian) and grandchild (Marisol) by their first names. No disrespect is intended.

2.

In 2007, Teresa was lying down because she had a toothache. When defendant got home from work, he was angry because there was no food. He started slapping Teresa. He hit her on the cheek; on the side "where the tooth was hurting." When Hitzia got between them, defendant hit her, too. He pulled Teresa by the hair and put his hands around her neck and squeezed. Hitzia called 911 and defendant was arrested. Later that year, Hitzia was awakened by her parents' arguing. She saw defendant with his hands around Teresa's throat, trying to pull her into the backyard. Teresa was trying to fight him off. When Hitzia told him to let Teresa go, he got scared and let go.

In 2011, defendant and Teresa separated. When defendant found out Teresa and the children were staying with a relative in Porterville, he started driving by the house and honking. The relatives were afraid of defendant, so Teresa and the children had to leave. Teresa decided to give defendant a second chance. Gladys, however, encouraged Teresa to stay away from defendant. Defendant told Gladys to leave, but Gladys stayed to protect Teresa.

In May 2012, defendant, Teresa, Pedro, Adrian, and Gladys lived in a Woodville Labor Camp. Hitzia lived with her husband, his parents, and three-year-old Marisol in Porterville. Gladys usually babysat Marisol at Teresa's house.

On May 17,[3] at about 5:00 a.m., Teresa woke Gladys. Teresa was "really antsy and super scared." Teresa said she did not want to go to work with defendant because she was scared for her life. Teresa said defendant had recently threatened her; she said they had been in a car, defendant had pulled over by a canal, and defendant said he wanted to kill her but could not, and that he would rather kill himself before he killed her. Gladys tried to convince Teresa to stay home, but Teresa decided to go to work. Teresa telephoned Gladys from the bathroom and said she was going to keep the phone on and hide it in the truck. Teresa told Gladys to call the police if Gladys heard defendant

---

**3**    Undesignated references to dates in the statement of facts are to the year 2012.

3.

threatening Teresa. Teresa left her phone on and Gladys was able to hear what was happening in the truck as Teresa and defendant drove to work. Gladys could hear defendant screaming at Teresa. When she heard him say, "The cops aren't going to find you," she woke Pedro. Pedro heard defendant screaming at Teresa and calling her a whore.

Gladys and Pedro went to get Teresa. They found their parents at the gas station in Poplar, where they usually stopped on the way to work. Teresa was coming out of the store, looking sad and scared, and Gladys told her to get in the car. Defendant was extremely angry. Teresa and the children went back to their house in the labor camp, but defendant got there before they did. Teresa and the children sat down in the living room. Defendant went to his and Teresa's bedroom and locked himself in. Gladys heard "a lot of shuffling of stuff" as if he was looking for something. Defendant then exited the room and asked Pedro, "Where's my gun?"[4] Teresa told defendant to leave. Later, that night, defendant returned to the residence. When he was still there the next day (Friday), Gladys, Pedro, and Hitzia provided money so their father could find a different place to live. Hitzia knew defendant had accused Teresa of cheating on him.

Defendant made arrangements to stay in a small trailer on a friend's property. Defendant told the friend he had family problems. He said his wife wanted to be the boss; he was not happy about that.

On Saturday, May 19, defendant finally left the family home. Gladys saw him packing his clothes and guitar, and Teresa loaned him some pots and dishes. Defendant took most of his belongings, except for some work shirts he shared with his son. While

---

**4** Sometimes, Pedro hid the gun from defendant. He was not hiding it on May 17, however; as of that date, defendant knew where it was. Pedro heard what sounded like defendant searching for something in his room, but did not actually see defendant getting the gun. Defendant had had the gun for about two years; he said he wanted it for protection, as there were frequent shootings in the labor camp. Defendant only had four bullets, but kept the gun loaded most of the time.

defendant was packing and loading his truck, Gladys did not hear any arguments between her parents. Later that day, Gladys heard her parents talking on the phone. They were having a normal conversation. Teresa was explaining to defendant how to record video on his phone.

On Sunday, May 20, the family went to Porterville. Before they left, Teresa received a number of phone calls from defendant. Defendant was planning to come to the house to shower. When they passed him on the way, he looked angry and did not say hello. When the family returned home, they found a picture of every one of them on the table with a note in defendant's handwriting saying he was never going to leave them alone.

On Monday, May 21, Hitzia's husband dropped Marisol off at the house so Gladys could watch her. Adrian, who was eight years old at the time, was also there. When Teresa and Pedro arrived home from work in the afternoon, Pedro went to his room. Defendant was supposed to meet Hitzia at a certain time and location, as she was trying to help him get a job.[5] Defendant did not show. Hitzia talked to defendant by phone at 2:53 p.m.[6]

Around 5:00 p.m., the family (except Pedro, who was in his room) was eating dinner when defendant arrived. He hugged Adrian and asked if he could shower. He had a blue plastic bag with him, and went into the bathroom. After he showered, he went into the living room, where Teresa and Marisol were present. Gladys was in her room, but had her door open so she could hear if defendant tried to scream at Teresa. Adrian was outside. Everything seemed fine between Teresa and defendant. At some point, Teresa

---

[5]    Teresa did not want defendant working at the same place she did anymore. Defendant had a girlfriend — Lydia Gonzalez — whom he had met through work. Teresa was aware of the relationship.

[6]    It is not clear whether the call was made to arrange their meeting or if it occurred after defendant did not arrive.

came into Gladys's room and said she was going to let defendant nap in the living room, as his eyes were very puffy and it looked like he had not slept much.[7]  Later, Teresa asked Gladys to come into the living room to set up the video game console so they could play.  Everything still seemed normal; Gladys could hear defendant and Marisol playing together.  Defendant was smiling and having a good time.  Still, Gladys kept her television on mute so she could go into the living room if she heard defendant scream at Teresa.  Gladys did not hear defendant accuse Teresa of having an affair, although he had been making that accusation at least since Gladys, who was 19 at the time of trial, was in middle school.

About 15 or 20 minutes later, Teresa asked Gladys to go outside to buy Marisol some churros.  Gladys said she could not, because she was already in her pajamas.  A short time later, Gladys heard the front door open.[8]  Gladys did not hear any arguments, but, a couple minutes after the door opened and closed, Teresa screamed, "No, Eleazar." As Gladys ran to the living room, she heard bangs.  When she got there, defendant was pointing the gun at Teresa from a couple feet away.  There was smoke coming out of the gun and a "firework kind of smell" in the air.  Teresa was sitting in the center of the couch.  She had her head back and her hand to her chest.  Her mouth was open, but her eyes were closed.[9]

---

**7**    Gladys thought he possibly had been crying.

**8**    At approximately 6:27 p.m., Hitzia was talking to Teresa by cell phone about the situation.  It did not sound like Teresa was talking to anyone else, although she did not sound like her normal self.  Hitzia did not realize defendant was at the residence, but Teresa suddenly yelled, "No, Eleazar, no."  Hitzia immediately heard three gunshots, then defendant screaming in Spanish, "I'm going to take her with me."

**9**    Teresa's neighbor was outside when Teresa and Marisol came out to buy a treat for Marisol from one of the trucks that came around.  Teresa and the neighbor talked for a few minutes, then Teresa went back into her house and closed the door.  About a minute later, the neighbor heard gunshots.  During the 35 minutes or so the neighbor had been outside prior to the shots, she did not hear any yelling or arguing.

Gladys screamed for Pedro, who had fallen asleep and was woken by a bang and Gladys screaming. Gladys initially entered the living room, but defendant looked angry, so she backed into the hallway. While she was backing away, he pointed the gun at her. When Pedro ran into the living room, he saw defendant pointing the gun at Teresa. Defendant then pointed the gun at Gladys and him. Gladys recalled defendant saying it was all Gladys's fault he did that, then he said it was her and her brother's fault. His face was "[f]ull of anger." He said he was going to go to heaven to Teresa, and he put the gun to his head. Pedro recalled defendant saying, "this is what happens because you get involved in my life."

Pedro ran in and went to hold Teresa, who was taking deep breaths. Pedro held her wounds to try to stop the bleeding, but she took three deep breaths and then "she was gone." Defendant said, "I'm not going to leave here today." He was standing in the same spot he had been when Pedro entered the living room, and he pointed the gun under his chin. Pedro saw Marisol walk in, and he screamed at Gladys to get her out of there. Marisol was standing to the side of the couch. She was looking around a lot, then she started crying and screaming. Gladys grabbed her and took her out of the room. Defendant told Pedro, "I'm not going to kill you. I'm going to let you live with this and suffer for the rest of your life." After a while, defendant sat down on the couch with the gun in his hand. He sat there a short time, then again pointed it at himself. Pedro told him to do it. Defendant's face showed no remorse or emotion.

Gladys called 911 from her room.[10] She told the dispatcher that her father had just shot her mother and was still in the house with a handgun in his hand. Gladys said he was "just fine" until he shot Teresa. Marisol said her grandfather killed her grandmother, and "pistola."

---

[10] A recording of the call was played for the jury.

While Gladys was on the phone with the 911 dispatcher, she saw Adrian coming to the house. She opened the window and told him to leave because their dad had shot their mom. She told him to go to their Aunt Guadalupe's house, which was on the other side of the building. Adrian started running in that direction. Gladys took Marisol out through the window, and they also went to Guadalupe's house.

Hitzia put down her cell phone and used the house phone to call 911.[11] She told the 911 dispatcher (who had already received a call about the shooting) that her father just shot her mother, and that she heard defendant screaming, "'I'm gonna take her with me,'" and three gunshots. She also heard her brother and sister screaming to leave her mother alone.

Deputy England arrived on scene about 6:37 p.m. From outside the front door, he could hear two mature male voices, one sobbing and the other speaking calmly. When England called to the person inside, the sobbing male — who was translating for the other man — replied that the other man wanted the deputies to shoot him.

Within a few minutes, defendant told Pedro to leave, that he was not going to do anything to him. Pedro opened the back door for deputies. Deputy McLean, who was fluent in Spanish, arrived and started talking with defendant. When McLean informed defendant that he wanted defendant to come out so deputies could check on his wife, defendant responded that there was no point; she was already deceased. Defendant said he would not leave on his own, and he wanted them to kill him as well. Defendant said he was holding his love and was going to die there with her.

The SWAT team was deployed to the location. Via a remotely controlled robot, they were able to ascertain that Teresa was on the couch, deceased. Defendant was lying on the couch with his head in her lap.

---

**11**      A recording of the call was played for the jury.

McLean spoke to defendant for an hour to an hour and a half, the duration of the incident.  At one point, defendant asked to speak to Gladys.  When McLean asked why, defendant said it was her fault.  Defendant also asked that his son not be around when he exited.  Defendant subsequently asked to write a letter to his mother.  He said he would take about five minutes, then he would come out of the residence.  McLean told him to go ahead.  Defendant subsequently said he was in the process of signing the letter, but did not want to come outside.  He said he was concerned, but gave no reason.

At some point, members of the SWAT team entered the house through the back door.  Defendant, who was still on the couch, was ordered to put his hands up, but did not comply.  He resisted when detectives took hold of him, but was handcuffed after a struggle.  As detectives started to walk defendant outside, he unsuccessfully tried to lunge forward and break free.

After defendant was removed from the house, a blue plastic bag containing men's clothing and a toothbrush was found on the couch.  Also on the couch was a .44 magnum revolver with a four-inch barrel.[12]  Three expended shell casings and one live round were found in the gun.  A beer can was on the floor.  No letter written by defendant to his mother was located.

Defendant was taken to the hospital where, after being advised of his rights, he spoke with Sheriff's Sergeant Torres.  At some point, defendant did get extremely emotional and cried.  Torres interviewed defendant again at the police station.  Defendant was, again, emotional at times.  Torres could smell an odor of alcohol on defendant "[s]omewhat," but he did not appear to be drunk.

An autopsy showed Teresa had three gunshot entry wounds to the front of her body, two to the chest and one to the right lower quadrant of the abdomen.  One of the

---

[12]     Because the gun was a revolver, the trigger had to be pulled to fire each individual round.

chest wounds was surrounded by a red abrasion ring, which suggested a barrel contact mark. The bullet that made this wound struck a rib and the breastbone and went through the heart. There were also three exit wounds to her back. The cause of death was gunshot wounds; although her heart may have continued to beat for a minute or so after they were inflicted, she was no longer able to function in a meaningful manner. Death was almost immediate.

## II

### DEFENSE EVIDENCE

Defendant, who was 51 years old at the time of trial, testified that he was 26 when he met Teresa. She was 16. They were married for about 10 years of the approximately 20 years they were together.

Defendant admitted being convicted of misdemeanor battery for the incident in 2007. He did not know Teresa's tooth was hurting until he was told. He did not grab Teresa around the neck; rather, he grabbed her on the shoulder, so she could go back to bed and he could cook.

Defendant denied having a girlfriend. Lydia was merely a friend, despite what his family thought. She was the foreperson of the place at which he worked. He did not have sex with her.

Defendant recalled the incident where he and Teresa drove out to a canal area. Defendant admitted making a threat, but said he was going to kill both of them if she kept on with her partner in the affair. Then he told her that he loved her too much to harm her, and they hugged and made up.

Two days before the shooting, defendant and Teresa were talking about being unfaithful. He was not certain she was having an affair, but they talked at length, then she told him the truth.[13] He was asked to leave the house, and so he went to a friend's

---

[13] Defendant had suspected Teresa was having an affair because she would touch her hair, and sometimes he would hear the back door close when he came home.

house and stayed in the friend's trailer. He was not happy to be living there and missed his family. He wanted to go back to Teresa, even though it was difficult because of what she had done. He was hoping she would ask him for forgiveness, but she did not.

On the day the children came to get Teresa at the gas station, defendant knew he was going to be kicked out of the house. He raced back to get there before they did, and went to his room to find his gun. He wanted to get it because he knew his family would try to hide it. Pedro had hidden it from him before, because Pedro had seen defendant grab the gun to shoot himself. Defendant found the gun and left it in a box with clothing in the laundry room area, despite the fact the area was not completely enclosed from the outside and so was accessible to anyone.

Defendant was at the family home on Sunday, May 20, when no one else was present. He took a shower. He also went through some photographs and put them out on the table with a note for his family. He did not take his gun that day, because he did not have any plans. He was hoping he and Teresa could resolve things.

On May 21, defendant was supposed to meet Hitzia and go to work, but he discovered his cell phone had run out of credit, and so he was unable to call her or the foreman to find out where they would be working. He stayed at the trailer that morning, talking to his friend, then went to the house. His intentions were to get back together with Teresa. He brought some clothes with him. The gun was still at the house, outside in the washroom. As he was driving to the family's house, he was not thinking about killing Teresa. He could not kill her. He wanted to kill himself in front of her if she did not listen to him. He went to the house to try to get her to get back with him, to talk about it, and for her to ask him for forgiveness.

When defendant arrived at the house, he hugged his son. He took a shower while he was there. He still had some belongings at the house; most of them — clothing and a toothbrush — were in a box outside the washroom. The gun was in or under a box where

11.

everyone's clothing was kept, close to his things.  When he got the gun, he put it in a plastic bag along with dirty clothes.

Marisol was playing games; defendant did not know how to play very well, but sat on the couch with her.  He was laughing at how smart she was.  His eyes were puffy; he had been crying and not sleeping well.  He was thinking about all the things Teresa was saying.  He could not believe she had been unfaithful.  Even though he noticed it, he never expected it to come out of her mouth.

Defendant tried to reconcile with Teresa, but she said she could not do it.  They did not argue this time; defendant asked her to tell him it was a lie, but she said it was true that she was having relations with another man.  She told him the person was her sister's husband, who was defendant's friend.  Defendant believed her, because this was the second time she had told him.[14]  Defendant was calmly trying to straighten things out until she told him again about the affair.  Although she only told him something he already knew, he did not "really believe[]" her until she told him the second time.  Defendant felt "a lot of anger."  He "just couldn't take it."  He imagined Teresa making love to the other man, and he just went and got the gun.  It was five or six feet away from him.  He had brought the gun into the living room before he had the talk with Teresa about the affair.  When he picked it up, Teresa was on the phone with Hitzia.  Without thinking it through, defendant fired.[15]  Defendant did not know how much time passed

---

[14]     The first time was the day before the argument that led to the children picking Teresa up at the gas station.  She and defendant were arguing about the affair.  Defendant had suspected for more than five years that Teresa had been having this affair, although he had never caught her doing anything physical with someone else.  He had no idea Teresa was so scared of him that she had turned on her phone so Gladys could listen.  If he had known the children were listening, he would not have been yelling at her and calling her names.  He admitted it was possible he threatened her.

[15]     On cross-examination, defendant stated he was not determined to kill Teresa initially.  He decided when he asked her about the affair.  He agreed with the prosecutor that he asked Teresa, then went and got the gun, and that when he went to get the gun was when he was determined to kill her.

from when she told him about the affair to when he fired. It was not very long. He did not remember walking five or six feet to grab the gun; it was not until Pedro came out of his room that he "came to." He remembered the gun in his hand after he shot. Before he shot, he did not remember having it; there was "so much anger in [his] head." It was "anger, emotions, everything together." He did not remember pulling the trigger until later. He did not want to shoot the gun. He wanted to kill himself. At that moment, he did not think about Teresa. He was thinking about himself.

After the gun went off, defendant had the gun in his hand, but he was not pointing it at Gladys and Pedro to shoot them. He was just talking with it in his hand.[16] In any event, the gun only had one bullet. That was the bullet that was going to be for him.[17] Defendant admitted telling Gladys and Pedro that if they had not gotten involved, it would not have happened, and he and Teresa would have been able to resolve things on their own. He said it was their fault. Defendant felt they had gone to the gas station to take Teresa away from him. If they had not gone, he and Teresa would have fixed everything themselves.

Defendant put the gun to his head and was going to pull the trigger, but Pedro told him not to. The gun was pointed at defendant's head, but it was also pointing in Pedro's direction. Defendant stopped and lowered the gun to wait for them to leave so he could shoot himself. After Pedro left, defendant lay down next to Teresa on the couch and hugged her, and he fell asleep. He knew that when the police came in, they were going to shoot him. That was what he wanted. He thought it was better that way. He wanted the police to kill him.

---

[16] On cross-examination, defendant said he thought he was trying to scare them when he pointed the gun at them.

[17] Defendant admitted that for him to save a bullet for himself, he had to know how many times he fired. He started to see things clearly after he fired. He did not try to help Teresa, however, because he was in shock and not thinking straight. He was also drunk. He had been drinking beer.

Defendant agreed with the prosecutor that he believed that as the husband, he should be the boss in the family. He was somewhat upset when he did not have control over Teresa. He conceded there were approximately 80 text messages between Teresa and him from the Saturday he left to the Monday he killed her.[18] There were also about 16 phone calls between the couple. He was doing anything he could to get back together with her, although he pretty much knew the relationship was over. He first thought that if he could not be with her, he would kill himself. When he realized he was not going to be with her, he decided he did not want her to be with another man. He went over to the house that day, and he was going to kill her and kill himself. However, when he was driving to the house, taking a shower, and playing with Marisol, he was not thinking about killing Teresa. He loved her. He loaded the gun that day in the laundry room because he was thinking of shooting himself. He did not remember aiming the gun at her. He told the police the reason he killed her was because she was unfaithful to him.

## DISCUSSION

## I

### THE JURY'S VERDICT SATISFIES THE REQUIREMENT OF SECTION 1157.

Count 1 of the information charged that "the crime of MURDER, in violation of PENAL CODE SECTION 187(a), a FELONY, was committed by [defendant], who did unlawfully, and with malice aforethought murder" Teresa. The prosecutor presented only one theory of first degree murder to the jury (premeditation), and jurors were instructed on that theory as well as on second degree murder and voluntary manslaughter based on heat of passion. Jurors returned a verdict finding defendant guilty "as charged in Count 1

---

[18] The text messages were admitted into evidence, but are not included in the record on appeal. During argument, however, the prosecutor stated, without objection or contradiction, that on the night of May 20, defendant texted Teresa, "Never will you be with another mother fucker."

14.

of the Information, of MURDER IN THE FIRST DEGREE, in violation of Penal Code section 187."

Defendant now contends that, because the information was silent as to degree and the jury was not asked to return, and did not return, any specific finding on the truth of an allegation of premeditation and deliberation, "the language of the verdict form, which incorporated the information, demonstrates the degree of the crime was not determined as required by section 1157. Therefore, the verdict must be fixed as murder in the second degree."[19]

In *People v. Jones* (2014) 230 Cal.App.4th 373, 376-379 (*Jones*), which was filed after briefing was completed in the present case, this court rejected an identical argument. There, after explaining the applicable legal principles, we found the jury's intent to convict the defendant of first degree murder "unmistakably clear." (*Id*. at p. 379.) We concluded: "Under the circumstances, the verdict form's reference to the information created no fatal uncertainty or ambiguity, and did not result in a legal impossibility. Because the degree of the crime was explicitly stated, defendant's substantial rights were not prejudiced. Defendant is not entitled to have the conviction reduced to second degree murder." (*Ibid*.)

There is no meaningful difference between the wording of the information and verdict in *Jones* and those documents here. *Jones* is dispositive. Defendant is not entitled to have his conviction on count 1 reduced to second degree murder.

---

**19** Section 1157 provides: "Whenever a defendant is convicted of a crime … which is distinguished into degrees, the jury … must find the degree of the crime … of which he is guilty. Upon the failure of the jury … to so determine, the degree of the crime … of which the defendant is guilty, shall be deemed to be of the lesser degree."

Defendant did not object to the wording of the verdict form or otherwise raise the issue in the trial court. Nevertheless, the Attorney General does not claim the issue has been forfeited for purposes of appeal. We assume the issue is properly before us. (See *In re Birdwell* (1996) 50 Cal.App.4th 926, 930-931, & cases cited.)

15.

## II

**THE EVIDENCE IS SUFFICIENT TO SUPPORT A VERDICT OF FIRST DEGREE MURDER.**

Defendant next contends the evidence was insufficient to support a verdict of first degree murder based on premeditation and deliberation. We disagree.

The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment. [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

"All murder which is perpetrated by … any … kind of willful, deliberate, and premeditated killing, … is murder of the first degree." (§ 189.) "[W]illful" simply means "intentional." (*People v. Moon* (2005) 37 Cal.4th 1, 29.) "[D]eliberate" means "'"formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."'" [Citation.]" (*People v. Memro* (1995) 11 Cal.4th 786, 862-863.) "[P]remeditated" means "'"considered

16.

beforehand."' [Citation.]" (*Id*. at p. 863.) Planning, motive, and manner of killing are pertinent to a determination of whether premeditation and deliberation exist (*People v. Marks* (2003) 31 Cal.4th 197, 230; *People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27), "but these factors are not exclusive nor are they invariably determinative. [Citation.]" (*People v. Marks*, *supra*, 31 Cal.4th at p. 230; see *People v. Thomas* (1992) 2 Cal.4th 489, 517.) "[W]hile premeditation and deliberation must result from '"careful thought and weighing of considerations"' [citation], [the California Supreme Court] continue[s] to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 332.) "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."' [Citation.]" (*People v. Memro*, *supra*, 11 Cal.4th at p. 863.)

We have set forth the evidence in the statement of facts, *ante*, and need not repeat it at length here. It showed planning and opportunity for reflection. For instance, Gladys told the 911 dispatcher defendant was "just fine" until he shot Teresa, and none of those who heard the gunshots heard any arguing. In addition, although defendant did not bring the gun with him to the house on the day of the killing, he knew where it was (having rushed home from the gas station to change its location the day he left so that his family could not hide it from him) and retrieved it prior to talking to Teresa about her purported affair. (See *People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Wharton* (1991) 53 Cal.3d 522, 547; cf. *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1267.) Significantly, defendant himself testified that when he went to get the gun, he was determined to kill Teresa. He also testified he was going to kill Teresa and himself when he went to the residence. The evidence also showed motive: Defendant believed Teresa was having an affair with his brother-in-law. Finally, the manner of killing indicated a deliberate intent to kill: three shots to the chest and abdomen from a large-caliber

handgun, at least one of which likely was fired while the gun was in contact with Teresa's body. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

We recognize defendant also testified he was *not* thinking of killing Teresa when he drove to the residence, took a shower, or played with Marisol, and that he loaded the gun because he was thinking of shooting himself. Jurors were not, however, required to believe him, particularly in light of his antecedent threats against Teresa's life.[20] Jurors also could have questioned his credibility in claiming he and Teresa had a discussion about the affair just before he shot her; Hitzia was on the phone with Teresa at that moment and testified she did not hear Teresa talking to anyone else and did not know defendant was at the house until she heard his voice after the shooting. In short, jurors reasonably could have rejected defendant's version of events, even though it was not contradicted by direct evidence. (See *People v. Silva* (2001) 25 Cal.4th 345, 369; *People v. Salaz* (1924) 66 Cal.App. 173, 181.)

Viewed as a whole, the evidence supported the jury's findings of premeditation and deliberation. (See, e.g., *People v. Manriquez, supra*, 37 Cal.4th at p. 577; *People v. Wharton, supra*, 53 Cal.3d at p. 547.) That the circumstances reasonably could have supported contrary findings is not cause for reversal. (*People v. Lewis* (2001) 25 Cal.4th 610, 643-644.) "[T]he relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder. [Citations.]" (*People v. Perez, supra*, 2 Cal.4th at p. 1127.) The evidence here was sufficient under this standard.

---

[20]     That defendant may have contemplated suicide does not mean he did not also premeditate taking Teresa's life.

# III

## DEFENDANT HAS FAILED TO ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL.

Defendant contends counsel's failure to request CALCRIM No. 522 constituted ineffective assistance of counsel.[21] Defendant has failed to establish counsel lacked a reasonable tactical purpose, and so we reject defendant's claim.

Murder is "the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).) It is divided into two degrees. (§ 189.) "'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. [Citations.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) "Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' [citation], the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter …. [Citation.] Such heat of passion exists only where 'the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition … to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"' [Citation.]" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

"[T]he "'existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and

---

**21** CALCRIM No. 522 reads: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] [¶] [Provocation does not apply to a prosecution under a theory of felony murder.]"

premeditation'" — an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree. [Citations.]" (*People v. Carasi*, *supra*, 44 Cal.4th at p. 1306.) "The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective.… The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective. [Citations.]" (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678, citations omitted.)

CALCRIM No. 522 expressly conveys the notion that provocation may reduce murder from first degree to second degree. It is, however, a pinpoint instruction that need not be given on the court's own motion. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333; see *People v. Rogers* (2006) 39 Cal.4th 826, 877-879 [discussing CALJIC No. 8.73, CALCRIM No. 522's counterpart].) As previously stated, defendant's jury was instructed on first and second degree murder, and on voluntary manslaughter based on heat of passion. Jurors specifically were instructed on what constituted heat of passion, and on provocation necessary to reduce murder to manslaughter. They were also specifically instructed, with respect to first degree murder, that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Defense counsel did not, however, request that the court instruct on the effect of provocation on the degree of murder, even after the deliberating jury sent out a note requesting "a clear definition of murder 2 verses [*sic*] murder."**22**

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a

---

**22** In answer to the jury's question, the trial court referred jurors to CALCRIM Nos. 500 (Homicide: General Principles), 520 (First or Second Degree Murder With Malice Aforethought), and 521 (First Degree Murder).

defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

"Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.]" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 333.) "'[C]ourts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation]." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]" (*Ibid.*; see *People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Defense counsel here clearly believed defendant's best chance was a voluntary manslaughter verdict, and he put all his efforts into obtaining that result. Particularly in light of defendant's testimony, this was reasonable trial strategy. The jury's question did not render it unreasonable, especially when that question did not directly speak to provocation and the instructions given did not prevent jurors from considering provocation in deciding whether defendant deliberated and premeditated Teresa's killing.

(See *People v. Castillo* (1997) 16 Cal.4th 1009, 1017-1018; see also *People v. Rogers*, *supra*, 39 Cal.4th at p. 880.)

Defendant postulates defense counsel's failure to request CALCRIM No. 522 and to argue to the jury that provocation can reduce first degree murder to second degree murder, suggests defense counsel was unaware of the applicable law. Obviously, "[a]n attorney's exercise of discretion in making tactical decisions regarding trial strategy must be both reasonable and informed." (*In re Visciotti* (1996) 14 Cal.4th 325, 348.) If shown by the record, counsel's unawareness of pertinent legal principles can demonstrate counsel failed to act as a reasonably competent attorney. (See *People v. Provencio* (1989) 210 Cal.App.3d 290, 304.) The record here shows no such unawareness, however. Defendant's speculation does not furnish cause for reversal.

**IV**

**T**HE SENTENCING MINUTES AND ABSTRACT OF JUDGMENT MUST BE CORRECTED.

As the Attorney General notes, the trial court's sentencing minutes and the abstract of judgment contain clerical errors. First, with respect to count 2, both documents show defendant sentenced to the *middle* term of four years. The reporter's transcript shows the trial court sentenced defendant to four years on count 2. Four years is the *upper* term prescribed for a violation of section 245, subdivision (a)(2), and it is clear the trial court intended that the upper term be imposed. Second, both documents refer to an enhancement/special allegation pursuant to section 12022.53, subdivision (a). No such enhancement exists as a matter of law (see § 12022.53), and the information did not contain any allegation, or the jury make any finding, under subdivision (a) of section 12022.53. Rather, the allegation and finding that involved subdivision (a) referenced subdivision (a) of section 12022.5.

This court has the inherent power to correct clerical errors on appeal. (*People v. Jones* (2012) 54 Cal.4th 1, 89; *People v. Baines* (1981) 30 Cal.3d 143, 150.) Accordingly, we will order the appropriate corrections.

22.

## **DISPOSITION**

The judgment is affirmed. The trial court is directed to cause to be prepared corrected sentencing minutes and an amended abstract of judgment that (1) show the upper term of four years imposed on count 2, and (2) remove all references to Penal Code section 12022.53, subdivision (a), and substitute instead Penal Code section 12022.5, subdivision (a), with respect to count 1. The trial court shall further cause certified copies of said documents to be transmitted to the appropriate authorities.

_____
DETJEN, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
PEÑA, J.

23.